UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
UNITED STATES OF AMERICA,

       - against -                                 11 CR 486 (DLI)

KUSHTRIM ABAZAGA,

       Defendant.
------------------------------------------------------------x

## SENTENCING MEMORANDUM
## ON BEHALF OF DEFENDANT KUSHTRIM ABAZAGA

LAWRENCE GERZOG
233 Broadway, Suite 2707
New York, New York 10279
(212) 486-3003
*Attorney for Defendant*
*Kushtrim Abazaga*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
UNITED STATES OF AMERICA,

        - against -                                11 CR 486 (DLI)

KUSHTRIM ABAZAGA,

        Defendant.
-------------------------------------------------------x

## SENTENCING MEMORANDUM
## ON BEHALF OF DEFENDANT KUSHTRIM ABAZAGA

This memorandum is respectfully submitted on behalf of Kushtrim Abazaga, who is scheduled to be sentenced on December 3, 2013. He was convicted on his plea of guilty to one count of Conspiracy to Distribute and Possession With Intent to Distribute Marijuana, in violation of 21 U.S.C. § 846 and 841(b)(1)(C). The Probation Department has calculated Mr. Abazaga's total offense level as 23, with a Criminal History Category of I, translating to a guideline imprisonment range of 46-57 months. (PSR, ¶ 152). Probation has also recommended that Mr. Abazaga receive credit for 2 global acceptance points, bringing his guideline range to 37-46 months, and has recommended that the Court impose a sentence of 37 months. The government has not objected to this

recommendation, and indeed, in the plea agreement with Mr. Abazaga, agreed to recommend to the Court that it apply global plea points.

Mr. Abazaga has been in custody since July 20, 2012, which on the day of sentencing, will have totaled 17 months, 14 days, or after the 15% "good time" deduction is considered, the equivalent of slightly more than 20.5 months. For the reasons shown below, Mr. Abazaga respectfully asks that the Court sentence him to a below the guideline sentence, reflecting the matters discussed herein.

## Legal Framework of Sentencing Determination

In *Gall v. United States*, 552 U.S. 38 (2007), the Supreme Court made clear that, under *United States v. Booker*, 543 U.S. 220 (2005), the sentencing guidelines remain a necessary starting point for determining a sentence, but cannot be the end of the Court's analysis. Rather, the sentencing court must evaluate all of the factors set forth in 18 U.S.C. § 3553(a). The *Gall* Court expressly rejected the notion that only "extraordinary" circumstances can justify a sentence outside of the guidelines range, and also rejected "the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence." *Gall*, 552 U.S. at 47.

The Court is required to impose a sentence that is "sufficient, *but not greater than necessary*" to achieve the purposes of sentencing set forth in section

3553(a)(2) (emphasis added). The Second Circuit has underlined this requirement, stating, "plainly, if a district court were to explicitly conclude that two sentences equally served the statutory purpose of §3553(a), it could not, consistent with the parsimony clause, impose the higher." *United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006).

In determining a sentence, the Court is required to consider the factors set forth in section 3553(a), including:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

© to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available; [and]

(4) the kinds of sentence and the sentencing range established for—

> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines. . . .

The Second Circuit has emphasized that "[a]lthough the sentencing judge is obliged to consider all of the sentencing factors outlined in Section 3553(a), the judge is not prohibited from including in that consideration the judge's own sense of what is a fair and just sentence under all the circumstances. That is the historic role of sentencing judges, and it may continue to be exercised." *United States v. Jones*, 460 F.3d 191, 195 (2d Cir. 2006).

### Nature and Circumstances of the Offense

Kushtrim Abazaga was, as the government has acknowledged, a minor participant in a larger conspiracy to import and distribute marijuana, participating only in New York based activities involving relatively modest, at least in comparison to others, amounts of marijuana. While he agreed in his plea agreement that he was liable under a Pinkerton theory for 400-700 kilograms of marijuana, because he knew or should have known that the conspiracy with which he was involved was responsible for that amount, Mr. Abazaga himself never had direct access to anything close to this amount of marijuana or the financial proceeds consistent with this amount of marijuana.

His conviction by guilty plea is his first felony conviction, and both parties agree that for Guidelines purposes he is a Category I offender. The Pre-Sentence Report includes no discussion of violence committed by Mr. Abazaga.

### Mr. Abazaga's History and Characteristics

Kushtrim Abazaga was born on August 19, 1982 in Gjakova, Kosovo, at the time an autonomous province within the country then known as the Socialist Federal Republic of Yugoslavia ("former Yugoslavia"). As the Court is aware, the former Yugoslavia was formed in 1943, combining several different areas with different ethnicities, including Serbia, Croatia, Bosnia and Herzegovina, Macedonia, Montenegro and Slovenia. Serbia contained two autonomous provinces, namely Kosovo, with a majority of ethnic Albanians, and Vojvodina. For decades, the Serbians had discriminated heavily against the ethnic Albanians, but when the former Yugoslavia was formed, ethnic Albanians were subject to less discrimination, being allowed to have university educations and to work for the government. Kushtrim's parents both had university degrees in economics, and responsible jobs with government related entities.

In 1992, when Kushtrim was 10 years old, the former Yugoslavia split apart. As the other areas seceded, Serbia and Montenegro remained together as the Federal Republic of Yugoslavia ("FRY"), under the leadership of international

5

war criminal Slobodan Milosevic. The Serbian dominated government of FRY began a brutal campaign of "ethnic cleansing" aimed at the ethnic Albanians in Kosovo. The lives of the ethnic Albanians in the FRY became increasingly like the lives of the Jews in Germany in the 1930s. Laws making discrimination against ethnic Albanians official national policy were passed, and random acts of violence against ethnic Albanians were ignored, and often abetted, by Serbian police and military authorities. In response, Kosovar nationalists began a movement to break away from the FRY and to form an independent country.

Kushtrim's parents, Skender and Emine Abazaga, became politically active on behalf of their fellow ethnic Albanians, although it was extremely dangerous to do so. As a result, both lost their jobs, and Mr. Abazaga was arrested, threatened, and tortured. When he was released, the family knew he had to leave Kosovo immediately or be killed. He was smuggled out of the country, and eventually arrived in the United States where he was granted political asylum. This left Kushtrim, as the oldest child in the family, in a position where he had to assume great responsibility, along with his mother, for the survival of the family, at an age when many boys have nothing more serious on their minds than playing sports. He would get up at dawn and walk for miles to stand in line for small rations of milk and food. He was in constant danger from roving bands of unregulated

Serbian thugs who could and did assault, and sometimes murder, ethnic Albanians with no concern for retribution. After Mr. Abazaga had fled Kosovo, the Serbian police visited the Abazaga home, and, with the Abazaga children present, threatened to rape Mrs. Abazaga in front of the children, kill the children in front of her, and the kill her. On another occasion, Kushtrim was summoned to the Serbian police station for "questioning," a euphemism for torture, which he ignored.

Finally, in 1999, the Abazaga family knew that they too had to leave the FRY or they would be arrested, tortured, and perhaps killed. They managed to enter Macedonia, but when they applied for papers to enter the United States, were told that they would have to travel to the U.S. Embassy in Belgrade, the capital of Serbia, essentially "the belly of the beast" for ethnic Albanians. By this time, Kushtrim's mother, who had also been arrested and released previously, began to suffer from Post Traumatic Stress Disorder ("PTSD"). It was Kushtrim who led the family from Macedonia to Belgrade, where they slept in alleyways and parks, afraid to check into a hotel because of their telltale Albanian names, and at Kushtrim's insistence, using hand signals to communicate so that their Albanian accents would not give them away. When they got their papers, they were refused entry on to the bus back to Macedonia, until Kushtrim prevailed on the

Macedonian bus driver that their ability to escape was literally a matter of life or death. After returning to Macedonia, the rest of the Abazaga family was able to join Mr. Abazaga in the United States a political asylees.

Attached as Exhibit A hereto is a report from Dr. Jelisaveta Rolovic, a New York State licensed psychologist, an ethnic Serb, and herself a refugee from the former Yugoslavia. The report indicates that Kushtrim Abazaga's trauma has had a deep and lasting effect on Kushtrim, as it would have had on anyone else similarly situated.

### Abazaga Family Health History

Kushtrim's father, Skender Abazaga, was taken to the hospital in August of 2000 on an emergency basis due to a major asthma attack which required him to be intubated and fully sedated in the Intensive Care Unit for 3 days. He spent a total of 5 days in the hospital. In January, 2010 Mr. Abazaga was once again rushed to the hospital due to a severe asthma attack. While hospitalized, he stopped breathing and the doctors once again intubated him in the ICU. He was intubated for 6 days and spent a total of 2 weeks in the hospital. Doctors have warned Mr. Abazaga that a recurrence of such an attack could happen at any time without warning, and could eventually prove to be disabling or fatal.

Kushtrim's mother, Emine Abazaga, was taken to the hospital on April 22, 2013, complaining of major abdominal pain. She was diagnosed with acute pancreatitis which turned into chronic pancreatitis. Mrs. Abazaga was treated for for 2 weeks in the intensive care unit. The doctors believed the cause of the pancreatitis were stones in the gallbladder, and she underwent a surgical procedure to have her gallbladder removed. She was released from the hospital 2 days later, although 30% of her pancreas was dead.

A week later, Mrs. Abazaga was returned to the emergency room, again suffering from major abdominal pain. The doctors again diagnosed her with acute pancreatitis – cause unknown - and found a 6cm cyst which had formed next to the pancreas. The portion of her pancreas that had become permanently and irretrievably damaged from her first attack became infected, and the infection started spreading in her body. Mrs. Abazaga was admitted to the intensive care unit once again. The next day she underwent another procedure to drain the cyst that had formed and was monitored with very high doses of morphine and antiobotics. A week later, on May 22, 2013, doctors were forced to do open abdominal surgery to remove the cyst and the dead portion of her pancreas. This was followed by 6 days of being intubated and fed through a feeding tube, with 2 drains hooked to her stomach to drain out the remainder of the fluid.

Mrs. Abazaga was released from the hospital on June 10, 2013 with 1 drain still placed in her stomach. As of this writing, she is still wearing the drain, as the pancreas is not healing properly and the doctors are estimating a 50/50 chance of another open surgery to remove another 20% of the pancreas that is not healing properly.

Kushtrim's only brother, Qlirim Abazaga, was diagnosed with a rare eye disease, Keratoconus (thinning of the cornea) in both of his eyes. He has lost 75% of the vision in his left eye and is considered legally blind. In January, 2013 he had to travel to Canada for a medical procedure designed to spare any further loss of vision, because the procedure has not been approved for use in the United States. Qlirim is still in treatment and it is not yet known if the procedure will be successful. The 75% lost vision will never be returned. The procedure was not approved by the Abazagas' medical insurer, and the family has had to pay out-of-pocket to travel to Canada and for the procedure itself, which has cost approximately $10,000 so far, with more costs anticipated.

The poor health of Kushtrim's parents, and the potential inability of brother Qlirim to contribute, has left the potential burden of caring for the Abazaga parents, who are still relatively young in their mid 50s, squarely on Kushtrim's shoulders. Since he is all but certain to be deported to Kosovo, now an

independent country struggling to gain its footing, recognized as independent by only half the world and sharing a border with an extremely hostile neighbor, the burden on Kushtrim of finding employment in Kosovo sufficient to support himself, any family of his own he may be lucky enough to have, and his potentially disabled parents will be enormous.

### Deterrence, Protection of the Public and the Most Effective Manner of Providing Appropriate Correctional Treatment

The crime Kushtrim Abazagas has committed cannot be minimized, and he is deeply remorseful for becoming involved, all the more so because of the extremely difficult medical and financial position his family has suffered subsequent to his arrest. This is his first felony conviction, and as stated, he is almost certain to be deported to Kosovo, a country where he no longer faces immediate ethic persecution but which is precipitously balanced between the threat of war and of economic collapse.

Attached as Exhibit B hereto are several letters of support written on Kushtrim's behalf. In these letters, and in Dr. Rolovic's report, it is made clear that Kushtrim's invovlement in this conspiracy was not typical of his character and can at least partially be explained by his damaged mental health from his experiences in wartime Kosovo and by his desire after coming to the United States

to maintain close ties to the ethnic Albanian community.

## CONCLUSION

For the reasons set forth above, the Court should sentence Mr. Abazaga to a below the guidelines sentence reflecting the matters discussed herein.

Respectfully submitted,

LAWRENCE GERZOG
233 Broadway, Suite 2707
New York, New York 10279
(212) 486-3003
*Attorney for Defendant*
*Kushtrim Abazaga*

Dated:   New York, New York
         October 21, 2013